1
2
3
4                        UNITED STATES DISTRICT COURT
5                             DISTRICT OF NEVADA
6    WENDY TYZBIR,                              Case No. 3:17-cv-00494-MMD-WGC
7                                Plaintiff,     **REPORT & RECOMMENDATION OF**
8          v.                                   **U.S. MAGISTRATE JUDGE**

9    NANCY A. BERRYHILL,                        Re: ECF Nos. 15, 16, 19, 20
     Acting Commissioner of
10   Social Security Administration,
11                               Defendant.
12

13         This Report and Recommendation is made to the Honorable Miranda M. Du, United States

14   District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

15   § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

16         Before the court is Plaintiff's Motion for Reversal and/or Remand. (ECF Nos. 15, 16.) The

17   Commissioner filed a Cross-Motion to Affirm and Response to Plaintiff's Brief in Support of

18   Motion for Reversal and/or Remand. (ECF Nos. 19, 20.)

19         After a thorough review, the court recommends that Plaintiff's motion be granted; the

20   Commissioner's motion be denied; and, that this matter be remanded for further proceedings

21   consistent with this Report and Recommendation.

22                                **I. BACKGROUND**

23         On, August 21, 2013, Plaintiff completed applications for disability insurance benefits

24   (DIB) under Title II of the Social Security Act and for supplemental security income (SSI) under

25   Title XVI of the Social Security Act, alleging disability beginning August 14, 2013.

26   (Administrative Record (AR) 185-196.) The applications were denied initially and on

27   reconsideration. (AR 133-136, 139, 141-146.)

28   ///

1    Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 147.)
2    ALJ Eileen Burlison held a hearing on November 2, 2015. (AR 38-66.) Plaintiff, who was
3    represented by counsel, appeared and testified on her own behalf at the hearing. Testimony was
4    also taken from a vocational expert (VE). On December 16, 2015, the ALJ issued a decision
5    finding Plaintiff not disabled. (AR 17-31.) Plaintiff requested review, and the Appeals Council
6    denied the request, making the ALJ's decision the final decision of the Commissioner. (AR 1-5.)

7    Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).
8    Plaintiff argues: (1) the ALJ's step four finding is not supported by substantial evidence because
9    the past jobs the ALJ found Plaintiff could perform do not meet the duration and recency
10    requirements pursuant to Agency policy; and (2) the ALJ erred when she found Plaintiff's mental
11    impairments result in no work-related limitations whatsoever.

12                                    **II. STANDARD OF REVIEW**

13    **A. Substantial Evidence**

14    The court must affirm the ALJ's determination if it is based on proper legal standards and
15    the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*
16    *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is
17    'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a
18    reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-
19    24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

20    To determine whether substantial evidence exists, the court must look at the record as a
21    whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740
22    F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not
23    affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,
24    759F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.
25    2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical
26    testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039
27    (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the
28    reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740

F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last fifteen years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(b)(1).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitation, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

///

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id*.

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely,

1   if the Commissioner determines the claimant unable to adjust to any other work, the claimant will

2   be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v.*

3   *Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

### III. DISCUSSION

**A. ALJ's Findings in this Case**

6       At step one, the ALJ found Plaintiff met the insured status requirements through March 31,

7   2017, and had not engaged in substantial gainful activity since the alleged onset date of August 14,

8   2013. (AR 22.)

9       At step two, the ALJ concluded Plaintiff had the following severe impairments:

10  diverticulitis, asthma, and obesity. (AR 22.) Regarding Plaintiff's statement that she suffered from

11  post-traumatic stress disorder (PTSD), the ALJ said there was no evidence in the record to

12  substantiate this is a medically determinable impairment. (AR 23.) While her medical records

13  indicate that she suffers from depression and anxiety, the ALJ concluded that the record

14  demonstrated her symptoms were controlled with medication. The ALJ discussed the mental

15  impairment opinion evidence, and ultimately found her depression and anxiety were not severe.

16  (AR 24-26.)

17      At step three, the ALJ determined Plaintiff did not have an impairment or combination of

18  impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 26-

19  27.)

20      At step four, the ALJ assessed Plaintiff as having the RFC to perform light work as defined

21  in 20 C.F.R. § 404.1567(b) and 416.967(b), except she was limited as follows: she could

22  occasionally balance, stoop, kneel, crouch and crawl; she should avoid working at heights and

23  operating dangerous moving machinery; she should work in a reasonably clean environment

24  avoiding fumes, dusts and gases; and, she should be in close proximity to a bathroom.

25      The ALJ then concluded Plaintiff could perform her past relevant work as an advertising

26  salesperson and automobile salesperson. (AR 29.) The ALJ stated that the work as an automobile

27  salesperson was performed within fifteen years of the alleged onset date. (AR 30.) The work as an

28  advertising salesperson was performed just outside the fifteen-year period, but the ALJ found it

1    was still relevant pursuant to Social Security Ruling (SSR) 82-62 based on the continuity of skills

2    and knowledge in the sales field between these two positions. (AR 30.) The ALJ stated that the

3    actual duration for these positions combined exceeded the durational requirements of SSR 82.62.

4    The ALJ noted that the VE testified that given the assigned RFC, a person of Plaintiff's age and

5    education could perform Plaintiff's past relevant work, as actually performed and as generally

6    performed. The ALJ did not make an alternative step five finding. As a result, the ALJ found

7    Plaintiff not disabled from August 14, 2013, through the date of the decision.

8    **B. Past Relevant Work Duration and Recency Requirements**

9    At step four, past relevant work is considered, and if a claimant can perform past relevant

10    work, he or she will be found not disabled. 20 C.F.R. § 404.1520(e) and § 416.920(e). Past relevant

11    work is that which a claimant performed in the last fifteen years, which lasted long enough for him

12    or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and

13    § 416.920(b)(1).

14    The ALJ identified Plaintiff's past relevant work as: (1) an advertising sales person

15    (Dictionary of Occupational Titles (DOT) 254.357-014, specific vocational preparation (SVP) 6,

16    light exertional level); and (2) Automobile Salesperson (DOT 273-353.010, SVP 6, light exertional

17    level). (AR 30.) The ALJ found that the automobile salesperson work was performed within fifteen

18    years of the alleged onset date. (AR 30.) With respect to the advertising salesperson work, the ALJ

19    acknowledged it was performed just outside the fifteen-year period, but found "it is still relevant

20    pursuant to SSR 82-62 based on the continuity of skills and knowledge in the sales field between

21    these two positions." (AR 30.) The ALJ also determined that the "actual duration for these

22    positions combined [ ] exceeded the durational requirements of SSR 82.62." (AR 30.) Therefore,

23    the ALJ concluded that this work met the requirements for past relevant work as defined in

24    SSR 82-62. (AR 30.)

25    Plaintiff argues that she did not perform the advertising sales person within the required

26    fifteen years, and that she did not perform the automobile sales position long enough to learn the

27    requisite skills.

28    ///

### 1. Advertising Sales Position

"[W]ork performed 15 years or more prior to the time of adjudication of the claim (or 15 years or more prior to the date the title II disability insured status requirement was last met, if earlier) is ordinarily not considered relevant." SSR 82-62, 1982 WL 31386 (1982).

> Recency refers to the time which has elapsed since the work was performed. A gradual change occurs in most jobs in our national economy so that after 15 years it is no longer realistic to expect that skills (or proficiencies) and abilities acquired in these jobs continue to apply. The 15-year guide is intended to insure that remote work experience which could not reasonably be expected to be of current relevance is not applied.

SSR 82-62.

> While the regulations provide that a claimant/beneficiary's work experience is usually relevant when the work 'was done within the last fifteen years,' in some cases work performed prior to the 15-year period may be considered as relevant when a continuity of skills, knowledge, and processes can be established between such work and the individual's more recent occupations.

SSR 82-62.

The fifteen-year period "is generally the 15 years prior to the time of adjudication at the initial, reconsideration or higher appellate level." SSR 82-62.

The ALJ acknowledged that the advertising sales position was performed outside the fifteen-year period, but said it was relevant "based on the continuity of skills and knowledge of the sales field between these two positions."

Plaintiff argues that the ALJ erred because she did not make any findings regarding what skills and knowledge were continuous between the advertising and automobile sales positions. Plaintiff points to the DOT descriptions for these occupations, and says that they do not indicate any obvious overlap.

The regulations do not preclude considering past relevant work older than fifteen years. At step four, "claimants have the burden of showing that they can no longer perform their past relevant work." *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). "Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion." *Id*.

The court agrees that the ALJ failed to make any factual findings to support the conclusion that there was a continuity of skills, knowledge and processes between the advertising sales job

and the automobile sales job so as to allow the court to determine whether that finding is supported by substantial evidence. The Commissioner is correct that the DOT provides descriptions of how the jobs are generally performed, but the ALJ did not provide any basis for the conclusion that there was continuity between the jobs, based on the DOT or otherwise, to allow the court to conclude it was proper under the circumstances to consider the advertising sales job performed outside the fifteen-year period.

### 2. Automobile Salesperson

The court will now address Plaintiff's argument that she did not perform the automobile salesperson job long enough to learn how to do it.

SSR 82-62 states:

> Duration refers to the length of time during which the person gained job experience. It should have been sufficient for the worker to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation. The length of time this would take depends on the nature and complexity of the work.

Plaintiff worked as an automobile sales person for six to eight months, between 2003 and 2004. (AR 60, 248.)

The ALJ did not cite any facts to support a conclusion that she performed the automobile salesperson position for long enough to learn how to perform the job. Instead, the ALJ found that when the automobile sales person and advertising salesperson jobs were combined, Plaintiff met the durational requirements of SSR 82-62.

When considered alone, the automobile salesperson job has an SVP of 6 under the DOT, which means it takes a person from one to two years to "learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."

Plaintiff did not perform the automobile salesperson job long enough to satisfy these requirements under the DOT, and the ALJ provided no factual basis for concluding she worked the job long enough to learn to do it. It is not clear whether the ALJ's conclusion to combine the two jobs insofar as recency is concerned is supported by substantial evidence. Therefore, there is also not enough information for the court to conclude that combining the jobs for the duration

1    standard was proper.

2    **3. Conclusion Regarding Past Relevant Work**

3    The matter should be remanded so that the ALJ may make specific factual findings, if

4    possible, regarding the continuity of skills, knowledge and processes between the automobile sales

5    and advertising sales job to support the conclusion that the advertising sales job could be

6    considered as past relevant work even though it was outside the fifteen-year period. The matter

7    should also be remanded for the ALJ to consider whether, if there is such continuity, it is such that

8    the advertising sales and automobile sales jobs could be combined for purposes of determining the

9    duration requirement for past relevant work, *i.e.*, whether Plaintiff performed the job(s) long

10   enough to learn to do it, taking note of the DOT requirements and, if applicable, obtaining VE

11   testimony to explain any conflicts. Alternatively, the ALJ could make a step five finding regarding

12   whether there are jobs that exist in sufficient numbers in the national economy that Plaintiff could

13   perform.

14   **C. Mental Impairments**

15   **1. Plaintiff's Mental Health Summary**

16   Plaintiff indicated she would try Prozac for her anxiety when she was seen for weight gain

17   and cold symptoms on October 19, 2012. (AR 988-89.) She was seen again on November 16, 2012,

18   for anxiety and lesions on her right arm.  (AR 990.) Her Prozac dosage was increased. (AR 992.)

19   Plaintiff was seen on November 16, 2012 at Nevada Health Centers, Inc. for a follow up

20   concerning her anxiety. (AR 356.) She had initially been seen there for anxiety on July 8, 2011.

21   She was experiencing panic attacks. (AR 356.) She reported doing well on Prozac, but felt she

22   would benefit from more, and her dosage was increased. (AR 358.)

23   After being seen in the emergency room, Plaintiff was admitted to a mental health facility

24   on September 17, 2013, for depression and suicidal thoughts. (AR 466-67, 473-74.) She reported

25   having been depressed since April, when her mother had passed away. (AR 467.) She had a

26   difficult time with it, and her husband drank and was violent, and had involved her in physical

27   altercations. (AR 467.) The precipitating act for this admission was a physical altercation where

28   her husband pulled her by the hair through a doorway which caused her neck pain and pain to the

1    left leg. (AR 469, 473.) She indicated that if her mother-in-law had not intervened, her husband

2    would likely have killed her. (AR 471.) She said that she had been recently diagnosed with Crohn's

3    Disease, which was causing her increased stress. (AR 471.) Her husband had recently lost his job,

4    which was also causing financial stress. (AR 471.) A longstanding history of mental health issues

5    and at least one prior inpatient stay was noted. (AR 471.) She was given medication, and expressed

6    a desire to be discharged because her daughter was about to have a baby. (AR 467.) She had a

7    depressed mood and congruent affect. (AR 472.) She admitted to having suicidal thoughts. (AR

8    472.) She was diagnosed with severe depressive disorder, and anxiety disorder. (AR 472.)  She

9    reported that group sessions were helpful, and that she would like to continue them in outpatient.

10   (AR 467.) At the time of discharge on September 19, 2017, she reported her mood was better, and

11   she denied further suicidal ideation. (AR 467.) She was described as having features consistent

12   with major depressive disorder, severe, and recurrent, and was advised to take her medications and

13   follow up with a therapist. (AR 467.) She was discharged upon a finding she was not an imminent

14   danger to herself or others. (AR 467.)

15       On October 2, 2013, Plaintiff reported depression and insomnia. (AR 642.) Memory

16   impairment was indicated. (AR 643.)

17       Plaintiff was seen in the emergency room on October 11, 2013, after taking too many

18   sleeping pills. (AR 417.) She stated that she took them because she was tired, and denied a history

19   of suicide attempts, although depression with suicidal ideation with a mental health admission on

20   September 17-19, 2013 was noted. (AR 417.) The impressions were that she overdosed on sleeping

21   medications in a suicide attempt. (AR 418.) She was placed on a legal hold, was observed and then

22   referred to mental health for admission. (AR 417-18.)

23       Plaintiff was admitted for psychiatric inpatient treatment on October 12, 2013, after taking

24   an intentional overdose of medication in an apparent suicide attempt. (AR 406-07.) Her

25   medications were administered and adjusted, and she attended group sessions which she found

26   beneficial. (AR 407.)  Her diagnoses included major depressive disorder without psychotic

27   features, anxiety disorder, borderline personality disorder, and chronic mental illness related to

28   medical and relationship problems with her husband, poor social support, unemployment and

financial problems. (AR 407.) She was discharged on October 21, 2013, with recommendations to follow up with medication management and outpatient counseling. (AR 408.) While admitted, she reported that after she passed out from taking the medication, her husband sexually abused her, and had been emotionally and physically abusive for some time. (AR 409.) She also indicated she suffered from depression related to her mother passing away earlier that year. (AR 409.) It was noted she had a longstanding past psychiatric history with several prior inpatient stays.  (AR 409.)

When she was examined on October 12, 2013, her speech was decreased, she was tearful at times, her thought process was illogical at times, and her mood was depressed. (AR 410.) On October 13, 2013, she relayed having significant depression with insomnia. (AR 411.) A history of depression with previous suicidal ideation and attempts was noted. (AR 411.) She indicated she was in a dysfunctional marriage with a physically abusive spouse. (AR 411.) She said she was not doing well, and felt sad secondary to her husband being arrested. (AR 413.)

On November 18, 2013, her therapist indicated she had severe, recurrent, major depressive disorder, and anxiety disorder. (AR 614.)

On December 5, 2013, Plaintiff was seen for a follow up concerning her mood disorder. (AR 637.) She reported that functioning was extremely difficult, and she had compulsive thoughts, a depressed mood, difficulty concentrating, difficulty falling and staying asleep, diminished interest or pleasure, she was easily startled, worried excessively, had fatigue, feelings of guilt, poor judgment, racing thoughts and restlessness. (AR 637.)

Plaintiff underwent a psychological evaluation by agency psychologist Sheri J. Hixon-Brenenstall, Ph.D., on January 14, 2014. (AR 624-630.) During the evaluation, Plaintiff's emotional expression and affect ranged from mild to moderately tense, anxious, worried, and tearful, with mild restlessness. (AR 624.) Plaintiff presented her own history, and Dr. Hixon-Brenenstall commented that Plaintiff and the records, which included psychiatric reports, were reliable and credible. (AR 624.) Her presenting psychiatric complaints included: depression; PTSD associated with childhood psychological and physical abuse; difficulty coping with the death of her mother; and, difficulty coping with her adolescent son relocating out of the area to reside with his biological father. (AR 624.) He records revealed a history of: major depressive disorder, severe,

1    recurrent; methamphetamine dependence in early remission; anxiety with symptoms of insomnia;

2    suicide attempt; Legal 2000 hold and psychiatric hospitalization; and, borderline personality

3    disorder. (AR 624.)

4         Plaintiff reported poor sleep. (AR 625.) She engaged in the following daily activities:

5    makes coffee, cares for her medical problems, cares for her own personal hygiene, prepares and

6    eats meals, does housework including making the bed and cleaning the house, attends doctors'

7    appointments and counseling, checks the mail, makes phone calls when needed, and watches

8    television. (AR 625.) She would sometimes do shopping and household errands, but those tasks

9    were often done by her husband. (AR 625.) She went to church, and socialized with family

10   members and two good friends. (AR 625.)

11        Dr. Hixon-Brenenstall indicated that Plaintiff had average intellectual functioning and

12   satisfactory social skills on MSE tasks. Clinically, she revealed a history of mood problems,

13   substance use problems, and emotional difficulty coping with a history of reported medical

14   problems and negative life events. (AR 626.) She had positive benefits from treatment targeting

15   her psychiatric symptoms. (AR 626.) Her responses to the interview were organized, logical and

16   relevant, and she did not have difficulty understanding the interview questions or MSE task

17   instructions. (AR 626.)

18        Plaintiff reported a history of experiencing suicidal thoughts, and acted on those thoughts

19   three times, with the last being in October 2013. (AR 626.) She rated her mood stability as a ten

20   on a scale of one to ten, with ten being severe. (AR 626.) She said that she always felt nervous,

21   worried, tense, sad, and tearful. (AR 626.) During the interview, her attention and concentration

22   abilities were satisfactory. (AR 626.)

23        She presented as possessing some insight into her psychological functioning, and at the

24   time of her interview, her judgment was satisfactory. (AR 626.)

25        In terms of a functional assessment, Dr. Hixon-Brenenstall opined Plaintiff was capable of

26   carrying out a range of detailed and complex instructions, and a variety of simple one and two-

27   step instructions reliably; her attention and concentration abilities were sufficient to carry out both

28   detailed and complex instruction, and simple one or two-step instructions; and, that her social skills

1    were sufficient to engage in appropriate interaction with others as one would expect in a range of

2    employment contexts. (AR 628-29.)

3        On February 6, 2014, her counselor noted that she avoids confrontation, and was falling

4    behind on doing her own laundry and paying bills. (AR 924.)

5        Dale Capurro, ACSW, LCSW, Plaintiff's social worker from Behavioral Health Outpatient

6    Services, provided an assessment based on evaluations on May 22, 2014, and July 11, 2014.

7    (AR 904-908.) Capurro relayed that Plaintiff initially started outpatient counseling after she was

8    discharged from an inpatient setting following an attempted overdose. (AR 904.) At that time, she

9    rarely left her home, and had a lot of avoidance issues which contributed to her problems.

10   (AR 904.) Carpurro indicated that Plaintiff had a tendency to understate her low moods and

11   depression or anxious thinking. (AR 904.) She did not show up for group therapy sessions at times

12   because she did not feel well psychologically. (AR 904.) A major source of her anxiety was her

13   husband's unsteady and unpredictable employment. (AR 905.) Other stressors were financial

14   factors and her son and daughter-in-law living with her. (AR 905.) She had difficulty dealing with

15   her mother's death. (AR 905.) She also experienced stress related to her chronic gastrointestinal

16   issues. (AR 905.)  She reported that in late April she had discontinued her medication, and then

17   she had suicidal thoughts. (AR 905.)

18       Capurro indicated Plaintiff was guarded about the specifics of abuse she endured as a child,

19   teen and young adult, suggesting a heavy trauma history that needed to be addressed. (AR 905.)

20   She did attest to abusive relationships and to witnessing a physically abusive relationship between

21   her father and mother. (AR 906.) Her diagnoses included major depression, recurrent and severe;

22   anxiety disorder; and, PTSD. (AR 907.)

23       Notes from May 9, 2014, indicate that Plaintiff was suicidal and attempted a medication

24   overdose, was revived at the hospital, and then treated in behavioral health care as an inpatient for

25   depression. (AR 912.) She had made some progress since she began outpatient care, but still had

26   periodic bouts of severe depression and suicidal ideation and intent. (AR 912.) It was noted that

27   she tried to avoid her thoughts of childhood abuse by her father, and continued to deny and

28   minimize feelings and anxiety/depression related thoughts. (AR 913.) She experienced physical

1    symptoms of her anxiety. (AR 913.) While she had made some good progress, she had experienced

2    setbacks related to conflict with interpersonal relationships and self-derogation central to her

3    depressive thinking and behavior. (AR 913.)

4        Plaintiff was seen on July 10, 2014, for suicidal thoughts. (AR 970., 1186) She was

5    admitted after voiding symptoms of depression and anxiety with suicidal ideation, following a

6    fight with her son and possible assault by her husband. (AR 984, 1186, 1194.) She was placed on

7    a legal hold pending assessment by behavioral health. (AR 1187-89.) Upon evaluation, she had a

8    depressed mood and flat affect. (AR 1194.) Her insight was fair, with a fair prognosis. (AR 1194.)

9    She presented with major depressive disorder. (AR 1195.)  She felt better after attending group

10   sessions, and felt stable enough to transition to outpatient care. (AR 984.) At the time of discharge,

11   she had speech of a decreased rate and tone, and a thought process that was illogical at times.

12   (AR 984.) Her diagnoses included major depressive disorder, severe without psychotic features,

13   anxiety disorder, and borderline personality disorder. (AR 984.) She was advised to follow up with

14   medication management and outpatient counseling. (AR 985-86.)

15       On July 11, 2014, Plaintiff was seen and was feeling very suicidal, and had been admitted

16   to psychiatric inpatient care. (AR 909.)

17       On July 24, 2014, she indicated she had been crying all day. (AR 983.) She discussed abuse

18   that occurred as a child.

19       On October 6, 2014, she was tearful in her session, discussing her husband's drug use and

20   associated behavior. (AR 977.)

21       Plaintiff presented to the emergency room on October 9, 2014, for suicidal thoughts.

22   (AR 1130.) She relayed she had been feeling depressed with suicidal thoughts, after serving a

23   restraining order on her husband. (AR 1130.) She was placed on a legal hold pending an assessment

24   by behavioral health. (AR 1130.) After an assessment, it was determined she was not a risk, and

25   was discharged. (AR 1132.)

26       On October 14, 2014, she called in for crisis support, stating that she was upset and missed

27   her husband after she had filed a restraining order against him after the fourth episode of domestic

28   violence. (AR 974.)

1       Records from October 27, 2014, indicate Plaintiff was seen follow a recent assault where
2   her husband punched her. (AR 969.)

3       On November 25, 2014, she reported feeling depressed relative to her husband being in jail
4   arrested after assaulting her). She reported recently that she got dressed for church, but then could
5   not go. (AR 971.)

6       On October 6, 2015, she was seen at Nevada Health Centers for anxiety, among other
7   things. (AR 1091.) On April 22, 2015, she was seen for a variety of issues, including depression.
8   (AR 1097.)

9       Plaintiff's treating psychologist, Dr. Dwarakanath Vuppalapati, completed a mental health
10  questionnaire for Plaintiff dated October 27, 2015. (AR 1295-1297.) Plaintiff's diagnoses
11  included: major depressive episode, recurrent; anxiety disorder, methamphetamine dependence in
12  early remission. (AR 1295.) Her symptoms included intermittent periods of low mood, lethargy,
13  and little sleep, occasional (semi-monthly or more frequent) panic attacks, dissociation, strong
14  urges to use methamphetamine. (AR 1295.) He also indicated that she experienced: anhedonia or
15  pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or
16  retardation, decreased energy, feelings of guilt or worthlessness; difficulty concentrating or
17  thinking; hyperactivity; pressure of speech; flight of ideas; decreased need for sleep; easy
18  distractibility; apprehensive expectation. (AR 1295.)  She had severe panic attacks manifested by
19  a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom
20  on average at least once a week. (AR 1296.) She also had recurrent obsessions or compulsions
21  which were a source of marked distress, and were usually family situation related. (AR 1296.)  She
22  exhibited social withdrawal or isolation, as well as pathological dependence or passivity.
23  (AR 1296.)

24      He reported that "except for some attentional and/or impulsive tendencies, she seems fairly
25  cognitively intact." (AR 1296.) Dissociation is a concern, but hypomanic and self-reclusion
26  episodically impede her ability to sustain adult function. (AR 1296.) He described Plaintiff as
27  having a "heavy trauma load," which began as a child. (AR 1296.) He opined that she had mild
28  restrictions in activities of daily living, in maintaining social functioning; moderate deficiencies of

concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and marked episodes of deterioration or decompensation in work or work-like setting which cause her to withdraw from the situation or experience exacerbation of signs or symptoms. (AR 1297.) As a result of these impairments, he estimated she would be absent from work on average four days a month. (AR 1297.)

Plaintiff testified she had been receiving psychological treatment once a week since October 2013, consisting of counseling and medications. (AR 52.) She did state that the medications were helpful. (AR 53.) She reported having severe anxiety, stating that sometimes the medication was helpful. (AR 54.) She stopped taking Xanax and Ambien because she had problems remembering things. (AR 54-55.) She indicated she sometimes had to stop her showers when she was feeling anxious. (AR 56.) She would not go to the grocery store if it were a time when there were a lot of people. (AR 56.) She was asked what kind of situations gave her panic attacks, and testified that when there are a lot of people in a room, such as when she walked in for her counseling sessions. (AR 56.) She testified she had previously attempted suicide, and had been to the hospital for that on two occasions. (AR 57.) She said the counseling she was receiving was not effective enough to keep her from having suicidal thoughts, which she had once a month. (AR 57-58.)

The hypothetical posed to the VE had no mental limitations in the RFC. (AR 65.) The VE testified that a person with that RFC could perform the past relevant work of automobile salesperson and advertising salesperson. (AR 65.)

Jack Araza, Ph.D., performed an initial case analysis and determined Plaintiff had the following mental impairment diagnoses: affective disorder and anxiety disorder. Dr. Araza found there were no restrictions on activities of daily living, difficulty maintaining social functioning or concentration, persistence or pace. (AR 87.)

On reconsideration, Pastora Roldan, Ph.D. included the following notes regarding her mental status:

> Claimant completed and notes she gets very anxious as she is always in the bathroom and is withdrawn. She cares for self, husband, and grandbabies. They also help take care of her. She does personal hygiene (hus does her hair). She prepares meals for them all, does laundry and dishes. Hus does yard work and 2

> people come in to help her w/HH chores. She doesn't drive due too stressful. She shops when daughter takes her, takes about an hour. She can handle money. Her interests are camping, gardening, crocheting, fishing and 4-wheeling but states she quit most of the outdoor activities. She chats w/ friends on the phone or they come by to watch TV 2-3 times a week. She goes to church. Family help remind her about appts. She becomes moody at times and prefers to stay at home. She can walk 2-3 blocks then rest 10-15min. Follows instruction okay but easily distracted. Best when she can write things do[w]n.

(AR 101.)

Dr. Roldan stated: "Overall her mental condition has not worsened, she maintains friendships, cares for family and home within physical limits." (AR 101.) She also concluded: "Mental is nonsevere, compliant with meds, no separate MH tx, no IP, ADLs done w/o problems. Nonsevere mental still appropriate." (AR 102.) Again, it was found she had no restrictions in activities of daily living, maintaining social functioning, or concentration, persistence or pace. (AR 103.) She had one or two repeated episodes of decompensation. (AR 103.) Dr. Roldan then included the same explanation for the opinion as was set forth in the initial denial by Dr. Araza. (AR 104.)

### 2. Step Two "Severe" Impairment Standard

As noted above, a social security claimant must have a severe impairment (or combination of impairments) that significantly limits the physical or mental ability to do basic work activities, or they are found not disabled. *See* 20 C.F.R. § § 404.1520(c), 416.920(c). If the ALJ finds the claimant has an impairment(s) that is severe, the ALJ will proceed to step three. An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities, which are defined as the abilities and aptitudes to do most jobs, such as: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *See* 20 C.F.R. § § 404.1521, 416.921. The claimant must prove the physical or mental impairment by providing medical evidence consisting of signs, symptoms and laboratory findings; the claimant's own statement of symptoms alone will not suffice. *See* 20 C.F.R. § § 404.1508, 416.908.

"A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its limiting effects on the individual's physical or mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself." SSR 85-28, 1985 WL 56856, at * 4 (1985). "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290) (emphasis original in *Webb*); *see also* SSR 85-28, 1985 WL 56856, at * 3 (1985). The step two inquiry is "a 'de minimis screening device [used] to dispose of groundless claims,' ... and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting *Smolen*, 80 F.3d at 1290).

### 3. The ALJ's Findings Regarding Plaintiff's Depression and Anxiety

In finding Plaintiff's mental impairments of depression and anxiety were not severe, the ALJ first stated that the symptoms were controlled with medication. (AR 23.) Second, the ALJ noted that in June and July 2013, she presented to her physician for complaints of diarrhea and pain, and was noted as having no unusual anxiety or evidence of depression. (AR 23.) Third, the ALJ discussed the fact that in October 2 2013, she was admitted due to major depression, with complaints of depression, insomnia and a suicide attempt by overdose. (AR 23.) The ALJ acknowledged Plaintiff's history of depression and suicidal ideation and attempts, and that she reported a dysfunctional marriage with a physically abusive spouse along with significant financial and social stressors. (AR 23.) The ALJ likewise acknowledged that Plaintiff was observed in the emergency department, placed on a legal hold, and then was transferred to Behavioral Health Services for inpatient therapy and management. (AR 23.) The ALJ recounted that Plaintiff was diagnosed with severe and recurrent major depressive disorder, was placed on medications, and after two days asked to be discharged to be with her daughter who was about to have a child. (AR 23.) Plaintiff was discharged with a finding she was no longer a danger to herself or others. ///

Fourth, the ALJ made note of Plaintiff's office visit in December 2013 related to a mood disorder, which was correlated with chronic pain and symptoms of her Crohn's disease. (AR 23.) The ALJ indicated that it was noted the depression was stable on Citalopram. (AR 23.) The ALJ commented on records from March 2014 that Plaintiff's depression was better controlled, and by June 2014 she was seeing a counselor weekly. (AR 24.)

Fifth, the ALJ discussed Plaintiff's seven-day admission in July 2014 related to depression, anxiety and suicidal ideations, and a subsequent visit to the emergency room where she suffered from anxiety after being struck by her husband in October 2014. (AR 24.) Plaintiff continued to receive mental health treatment for depression and anxiety in 2015. (AR 24.) Plaintiff underwent depression screening in October 2015, which the ALJ said showed the disorder was stable with ongoing care, therapy and psychiatric visits. (AR 24.)

After providing this summary, the ALJ stated:

> There is no indication in the record that the claimant's mental impairments were no longer controlled with medications at the time of the hearing. In fact, at the hearing, the claimant testified that she continues to seek counseling once per week since October 2013. She further testified, in the past she had problems remembering things due to certain medications, but since she stopped taking them, she no longer has these problems. She testified she still has anxiety in crowds and suicidal thoughts, but she admitted her treatment has helped her not act on those thoughts. The claimant did not testify that she had any other symptoms related to her mental impairments that would prevent her from performing basic work activities that fit within the below residual functional capacity.

(AR 24.)

The ALJ went on to assess the opinion evidence. The ALJ first addressed the opinions of State psychological disability examiner Dr. Araza from the initial disability determination, who found Plaintiff had no restrictions in activities of daily living, no difficulties maintaining social functioning, concentration, persistence or pace, and that her ability to perform basic work activities was not limited by her mental impairments. (AR 24.) The ALJ gave this opinion significant weight, finding it consistent with the longitudinal evidence of record. (AR 24.)

Next, the ALJ addressed the opinions of State psychological disability examiner Dr. Roldan, who reviewed Plaintiff's records on reconsideration. (AR 25.) Dr. Roldan adopted Dr. Araza's opinion, and found Plaintiff's mental conditions had not worsened, she maintained

friendships, cared for family and her home within physical limitations, and her condition remained controlled and not severe. (AR 25.) The ALJ gave this opinion significant weight for the same reasons as were proffered with respect to Dr. Araza. (AR 25.)

The ALJ went on to address the psychological consultative examination by Dr. Hixon-Brenenstall. (AR 25.) The ALJ gave these opinions significant weight because they were based on her personal evaluation of Plaintiff in addition to her review of the medical evidence. (AR 25.) Again, the ALJ found that the opinions were supported by the longitudinal evidence of record, and were consistent with the opinions of Dr. Araza and Dr. Roldan. (AR 25.)

Finally, the ALJ addressed the opinions of Plaintiff's treating psychiatrist, Dr. Vuppalapati. The ALJ gave his opinions partial weight because he did not point to specific clinical findings to support his opinions, and because they were based on a check-the-box form. (AR 25-26.) She found there was insufficient evidence in the record to support his opinion she would be absent from work four days a month. (AR 26.)

In sum, the ALJ found Plaintiff's depression and anxiety non-severe because they were well controlled with medication and three out of four opinions supported that finding.

### 4. Analysis

In finding Plaintiff's mental impairments not severe, the ALJ gave support to opinions of the non-treating and non-examining State psychologists over those of Plaintiff's treating psychiatrist.

"'In disability benefits cases … physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "Courts 'distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.'" *Id*. "[T]he opinion of a

treating physician is thus entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing *Ryan*, 528 F.3d at 1198). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (citation and quotation marks omitted); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2))). "Greater weight is also given to the 'opinion of a specialist about medical issues related to his or her area of specialty.'" *Revels*, 874 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)(5)). "'The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012. "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight … even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* (citation omitted).

If an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) in determining how much weight to give each opinion. *See Revels*, 874 F.3d at 654. The factors include: length of treatment relationship and frequency of examination, nature and extent of

treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c), § 416.927(c). The failure to consider these factors constitutes reversible legal error. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017).

Dr. Vuppalapati was Plaintiff's treating psychiatrist, and even though his opinions were contradicted by the State agency psychologists, his opinion was still owed deference. *Garrison*, 759 F.3d at 1012 (citation omitted). In addition, the ALJ was required to set forth specific and legitimate reasons supported by substantial evidence, and include a discussion of the factors in 20 C.F.R. § 404.1527. The ALJ did not discuss all of the factors. Moreover, the court finds the ALJ's reasons for according Dr. Vuppalapati's opinions partial weight, and the other opinions significant weight, are not supported by substantial evidence in the record. Again, the relevant question is whether her mental impairments had no more than a minimal effect on an individual's ability to work, so the ALJ could properly determine they were not severe.

Dr. Araza's opinions, which were adopted by Dr. Roldan, as well as those of Dr. Hixon-Brenenstall, were not in fact supported by the "longitudinal evidence of record." If the ALJ had the longitudinal evidence of record in mind, the ALJ would have taken into account that the overall picture of Plaintiff's mental health: a person with *severe and recurrent major depressive disorder as well as anxiety disorder*. While Plaintiff's impairments were at times controlled with medications, she had numerous admissions for mental health related issues, including suicidal ideations and suicide attempts between September 2013 and October 2014. *See e.g. Garrison*, 759 F.3d at 1017 (reports of improvement must "be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace"). While there were notes of some progress, there were just as many records indicating setbacks. When she was admitted, she exhibited illogical thought processes, and was often tearful.

Nor do those opinions take into account the notations in the record that she was reclusive and had social anxiety. The fact that she was able to maintain a few friendships and take care of her family does not address her social anxiety symptoms, which is salient to how she would be

able to perform in a workplace with strangers, particularly when that workplace was a sales job that would undoubtedly involve interaction with the public. Notably, Dr. Roldan's comment that Plaintiff could take care of her family within her physical limitations did not account for the numerous discussions in her records regarding the difficulty she had with her family members and how that caused her significant stress and anxiety. The ALJ did not mention the findings concerning avoidance, or that she tended to understate her mental health issues, and often did not show up to group sessions because she was not feeling well mentally.

With respect to Dr. Hixon-Brenenstall, the ALJ repeatedly highlighted the fact that Dr. Hixon-Brenenstall's diagnoses of major depressive disorder, anxiety and borderline personality disorder were based only on a history given by Plaintiff, without acknowledging that these diagnoses were all consistent with the findings of her treating providers. Moreover, the ALJ failed to acknowledge Dr. Hixon-Brenenstall's conclusion that Plaintiff's history and her records, which included psychiatric reports, were reliable and credible.

The ALJ relied on Dr. Hixon-Brenenstall's description of Plaintiff's appearance and cooperation during that single interview, and acknowledged but did not substantively discuss Dr. Hixon-Brenenstall's observation that Plaintiff's expression and affect ranged from mild to moderately tense, anxious, worried and tearful. The ALJ discussed Dr. Hixon-Brenenstall's findings regarding Plaintiff's daily activities, which included: waking for the day, making coffee, caring for her medical problems, caring or her personal hygiene, preparing and eating meals, doing housework, attending doctors' appointments, attending counseling appointments, checking the mail, administering medications, making phone calls, watching television, shopping, attending church one day a week, and socializing with family and two friends. The ALJ did not address, however, how these particular activities translated to a work environment. Nor did the ALJ account for Plaintiff's clarifying statements (acknowledged by Dr. Roldan) that while she cared for her family, they also helped take care of her; that her husband did the yard work, and she had people help with household chores; that she did not drive because it was too stressful; that she would shop when her daughter took her; that she had outdoor interests, but quit most of them; that her family helped to remind her of appointments; that she would become moody and preferred to stay home;

1    or that she was easily distracted.

2        Dr. Hixon-Brenenstall opined, without any real discussion, that Plaintiff could carry out

3    detailed, complex and simple instructions, and that her social skills and interpersonal interactions

4    were sufficient to engage in appropriate interactions with others in a range of employment

5    contexts.

6        The ALJ found error with Dr. Vuppalapati's opinions because he did not point to specific

7    clinical findings to support his opinions and used a check-the-box form. "[T]here is no authority

8    that a 'check-the-box' form is any less reliable than any other type of form; indeed, agency

9    physicians routinely use these types of forms to assess the intensity, persistence or limiting effects

10   of impairments." *Trevizo v. Berryhill*, 871 F.3d 664, 677 n. 4 (9th Cir. 2017). There, the court said

11   the "ALJ was not entitled to reject the responses of a treating physician without specific and

12   legitimate reasons for doing so, even where those responses were provided on a 'check-the-box'

13   form, were not accompanied by comments, and did not indicate to the ALJ the basis for the

14   physician's answers." *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). This is

15   exactly what the ALJ did here, and as such, the ALJ erred. The ALJ did not discuss whether

16   Dr. Vuppalapati's opinions were supported by Plaintiff's medical record, and instead discredited

17   him mainly for using the check-the-box form to provide his opinions.

18       Here, the ALJ minimized many of the negative portions of the record in concluding

19   Plaintiff's condition was well controlled with medication, and in doing so, ignored the broader

20   picture of her mental health. *See Garrison,* 759 F.3d at 1017, n. 22 (citing *Hutsell v. Massanari*,

21   259 F.3d 707, 711 (8th Cir. 2001) ("Given the unpredictable course of mental illness, [s]ymptom-

22   free intervals and brief remissions are generally of uncertain duration and marked by the impending

23   possibility of relapse.")); *Garrison*, 759 F.3d at n. 23 (citing *Scott v. Astrue*, 647 F.3d 734, 739-40

24   (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support

25   a denial of benefits. … The very nature of bipolar disorder is that people with the disease

26   experience fluctuations in their symptoms, so any single notation that a patient is feeling better or

27   has had a 'good day' does not imply that the condition has been treated.")); *Holohan v. Massanari,*

28   246 F.3d 1195, 1205 (9th Cir. 2001) (a person who suffers from severe panic attacks, anxiety and

1    depression that makes some improvement does not mean that the impairments no longer seriously

2    affect her).

3        In sum, the court finds that the ALJ's determination that Plaintiff's mental impairments of

4    epression and anxiety were not severe (i.e., did not have more than a minimal effect on her ability

5    to work) is not supported by substantial evidence in the record. Therefore, the action should be

6    remanded on this additional basis so that the ALJ can consider these impairments as severe, and

7    determine how this affects her RFC and the ultimate disability determination.

8                                    **IV. RECOMMENDATION**

9        **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING**

10   Plaintiff's motion, and **DENYING** the Commissioner's cross-motion. The matter should be

11   remanded for further proceedings consistent with the findings in this Report and Recommendation.

12   The parties should be aware of the following:

13       1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local

14   Rules of Practice, specific written objections to this Report and Recommendation within fourteen

15   days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and

16   Recommendation" and should be accompanied by points and authorities for consideration by the

17   District Court.

18       2. That this Report and Recommendation is not an appealable order and that any notice of

19   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

20   until entry of the District Court's judgment.

21       DATED: March 28, 2018.

22

23                                    William G. Cobb
                                      _____

24                                    WILLIAM G. COBB
                                      UNITED STATES MAGISTRATE JUDGE

25

26

27

28